JS-6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE: WALLDESIGN, INC.,)    Case No. SACV 15-00167-VAP
A SUBCHAPTER S        )    Case No. SACV 14-01724-VAP
CORPORATION.          )
_____    USBC Case No. 8:12-bk-10105-CB

**ORDER (1) REVERSING THE
BANKRUPTCY COURT'S DECISION
AND REMANDING FOR FURTHER
PROCEEDINGS; AND (2)
ADMINISTRATIVELY CLOSING
CASE NUMBER 8:14-CV-01724**

Michael Bello ("Bello") was the sole shareholder, sole director, and president of Walldesign, Inc. ("Walldesign"), a California corporation. Bello opened a bank account in Walldesign's name but kept it secret from others at Walldesign. He covertly placed Walldesign funds into this account and spent them on his personal expenses.

In total, Bello made approximately $8 million in payments from the account to approximately 130

individuals or entities.  None of these payments were for
Walldesign.  As part of these payments, Bello gave over
$220,000 to Appellees Donald F. Buresh and Sharon J.
Phillips ("Buresh & Phillips") to purchase the real
property where the Bello Family Vineyard, LLC tasting
room is located.

Walldesign filed its Chapter 11 petition for relief
on January 4, 2012.  The Official Committee ("the
Committee") of Unsecured Creditors of the Estate of
Walldesign, was appointed on January 26, 2012.[1]  The
Committee brought 96 separate adversary proceedings to
recover payments Bello made from the secret account,
including the payments to Buresh & Phillips.

Buresh & Phillips filed a motion for partial summary
judgment against the Committee on June 19, 2014.  The
Bankruptcy Court granted that motion, and the Committee
timely filed the instant appeal.

The Court finds that oral argument is not necessary
to resolve the appeal.  See Fed. R. Civ. P. 78; L.R. 7-
15.  After considering the briefs submitted by both
sides, and reviewing the record, the Court REVERSES the

_____

[1]Brian Weiss is now the acting trustee of the
Walldesign Liquidation Trust, which is the successor-in-
interest to the rights of the Committee.  (Opening Br. at
4 n.4.)  The Court considers the Committee the Appellant
for ease of reference.

2

decision of the Bankruptcy Court, and REMANDS for further proceedings.

## I. BACKGROUND

The Bankruptcy Court held that Buresh & Phillips were subsequent transferees under 11 U.S.C. § 550(a)(1), and that they accepted the payments for value, in good faith, and without knowledge of the payments' voidability. (See E.R. at 958-59.)[2]  The Committee, therefore, could not recover the payments from them.

In this appeal, the Committee filed its opening brief on May 4, 2015.  (See Doc. No. 8 ("Opening Br.").) Buresh & Phillips filed their responsive brief on May 18, 2015.  (See Doc. No. 9 ("Responsive Br.").)  The Committee filed its reply brief on June 1, 2015.  (See Doc. No. 12 ("Reply Br.").)[3]

---

[2] Citations to the Committee's excerpts of record (see Doc. Nos. 8-1 to 8-4) are as follows: "E.R. at [page number]."

[3] On May 18, 2015, Buresh & Phillips also filed a Motion to Strike Portions of Appellant's Opening Brief. (Doc. No. 10 ("Motion to Strike").)  The Committee filed an opposition on May 22. (Doc. No. 11.)
In the Motion to Strike, Buresh & Phillips request that the Court strike a footnote in the Committee's Opening Brief because it references an exhibit that is not a part of the record on appeal.  (Motion to Strike at 2.)  The exhibit is a transcript of oral argument at the Bankruptcy Court, which did not involve Buresh & Phillips, and which occurred after the Committee filed the original notice of appeal in this case (see Case No. 8:14-cv-01724-VAP).
The footnote and the cited exhibit contain only
(continued...)

3

1    This Court has appellate jurisdiction pursuant to 28

2  U.S.C. § 158(a)(1).  The Bankruptcy Court certified the

3  order as final and immediately appealable pursuant to

4  Federal Rule of Civil Procedure 54(b).  (See E.R. at 987-

5  91 ("Order").)

6

7                      **II. LEGAL STANDARD**

8    A "district court functions as an appellate court in

9  reviewing a bankruptcy decision and applies the same

10 standards of review as a federal court of appeals."  In

11 re Crystal Props., Ltd., 268 F.3d 743, 755 (9th Cir.

12 2001) (quoting another source).  Accordingly, "[a]

13 district court reviews a bankruptcy court's conclusions

14 of law and interpretation of the Bankruptcy Code de

15 novo."  In re Orange Cnty. Nursery, Inc., 439 B.R. 144,

16 148 (C.D. Cal. 2010).  It reviews factual findings for

17 clear error, and it "must accept the bankruptcy court's

18 findings of fact unless, upon review, the court is left

19 with the definite and firm conviction that a mistake has

20 been committed by the bankruptcy judge."  In re Greene,

21 583 F.3d 614, 618 (9th Cir. 2009) (citing Latman v.

22 Burdette, 366 F.3d 774, 781 (9th Cir. 2004)).

23

24

25        [3](...continued)

26 irrelevant information.  Moreover, the cited exhibit was
   not designated as part of the record on appeal.  See,
27 e.g. Credit Alliance Corp. v. Idaho Asphalt Supply, Inc.
   (In re Blumer), 95 B.R. 143, 147 (B.A.P. 9th Cir. 1988).
28 The Court, therefore, GRANTS the Motion to Strike.

**III. FACTS**

The facts are not in dispute.

**A.   Walldesign**

Walldesign, established in 1983, is a California corporation.  (Responsive Br. at 4.)  Until 2012, it installed drywall, insulation, acoustical material, and plaster, and provided construction-related services to single and multi-family housing projects in California, Nevada, and Arizona.  (<u>Id.</u> at 5.)  It maintained its primary bank account at Comerica Bank in El Segundo, California ("the Comerica Account").  (<u>Id.</u> at 4-5.)

Bello was Walldesign's sole shareholder, sole director, and president.  (Opening Br. at 4.)

**B.   The Secret Account**

On November 1, 2002, Bello opened a different bank account in Walldesign's name at Preferred Bank in Irvine, California ("the Secret Account").  (<u>Id.</u> at 4.)  He used Walldesign's Federal Tax I.D. Number, a Statement by Domestic Stock Corporation, Walldesign's Articles of Incorporation, a Unanimous Consent of Shareholder of Walldesign to Corporate Action, and a signature card granting him signing authority as an agent of Walldesign to open the Secret Account.  (<u>See</u> E.R. at 873-88.)  He also used his personal residence as the Account's

address, did not disclose the Account in Walldesign's general ledger or other books and records, and made his wife – who was not a Walldesign employee – a signatory to the Account.  (Responsive Br. at 5.)

Walldesign purchased materials for its business in bulk, and its suppliers occasionally issued rebates or refunds for these purchases.  (Id. at 6.)  Rather than deduct the refund or rebate from the total invoice, the suppliers issued checks to Walldesign for the difference. (Id.)  Bello did not deposit these checks into the Comerica Account; instead, he deposited them into the Secret Account and actively concealed the deposits from Walldesign's management and employees, its creditors, and the Bankruptcy Court.  (Id.)[4]

Bello used the money in the Secret Account to cover expenses unrelated to Walldesign, including operating costs for Bello Family Vineyard, a winery, and Michael Bello LLC, a horseracing stable, as well as other entities he controlled; his Las Vegas casino bills; his personal expenses charged on his American Express credit card; and his homeowners' association and country club

---

[4]After it filed a voluntary Chapter 11 petition, Walldesign filed its Schedules and Statements of Financial Affairs, executed by Bello under penalty of perjury, with the Bankruptcy Court.  (Opening Br. at 4 n.5.)  Bello did not disclose the Secret Account on these Schedules.  (Id.)

fees for two private golf courses. (<u>Id.</u>) In total,
Bello made approximately $8 million in payments from the
Secret Account to about 130 persons or entities. (<u>Id.</u> at
6-7.) None of the funds from the Secret Account were
spent for Walldesign purposes. (<u>Id.</u> at 7.)

**C.   Buresh & Phillips**

Buresh & Phillips are a married couple who owned the
real property located at 929 Main Street, St. Helena,
California ("the Property"). (<u>Id.</u>) They agreed to sell
the Property to Bello so they could pay personal debts
and fund their retirement. (<u>Id.</u>)

Between June 24, 2009 and October 29, 2011, Bello
made several payments, totaling over $220,000, to Buresh
& Phillips to purchase the Property, which became the
site of the Bello Family Vineyard tasting room. (Opening
Br. at 5.) Bello made these payments using checks drawn
on the Secret Account. (<u>Id.</u>) These checks bore the name
"WALLDESIGN INCORPORATED." (<u>Id.</u>)

## IV. DISCUSSION

The Committee presents two questions on appeal. The
first is whether Buresh & Phillips constitute "initial
transferees" under § 550(a)(1). Only if they are not
initial transferees, and are instead subsequent
transferees, must the Court address the second question:

whether Buresh & Phillips accepted the payments from
Bello in good faith and without knowledge of the
voidability of those transfers.  (See Opening Br. at 2-3;
Responsive Br. at 2-3.)

The Court holds Buresh & Phillips are initial
transferees under § 550(a)(1), for the reasons set forth
below.

**A.   Defining "Initial Transferee"**

Under the Bankruptcy Code, a trustee of the debtor
may recover a fraudulent transfer of estate property from
either "(1) the initial transferee of such transfer or
the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial
transferee."  See Schafer v. Las Vegas Hilston Corp. (In
re Video Depot, Ltd.), 127 F.3d 1195, 1197 (9th Cir.
1997) (quoting 11 U.S.C. § 550(a)).

The distinction between an "initial transferee" and a
subsequent transferee is critical.  See id.  "The
trustee's right to recover from an initial transferee is
absolute."  Id. at 1197-98 (quoting Danning v. Miller (In
re Bullion Reserve), 922 F.2d 544, 547 (9th Cir. 1991)).
A subsequent transferee, on the other hand, has a
defense.  A trustee may not recover from a subsequent
transferee if "the subsequent transferee accepted the

1    transfer for value, in good faith, and without knowledge

2    of the transfer's voidability." _Id._ at 1198; _see also_ 11

3    U.S.C. § 550(b)(1).   Therefore, if Buresh & Phillips are

4    initial transferees, the Committee has an absolute right

5    to recover the transfers at issue.

6

7        "Section 550(a) does not define the phrase 'initial

8    transferee.'"  _In re Incomnet, Inc._, 463 F.3d 1064, 1069

9    (9th Cir. 2006).[5]  Over the years, judges have crafted

10   two distinct tests to determine whether a party is an

11   "initial transferee" under § 550(a)(1): the "dominion

12   test" and the "control test."  _Id._  The Ninth Circuit has

13   explicitly adopted the dominion test; it has declined to

14   adopt the control test.  _See id._ at 1070.[6]

15   _____

16       [5]The Bankruptcy Code defines "transfer" broadly to
     mean "each mode, direct or indirect, absolute or
17   conditional, voluntary or involuntary, of disposing of or
     parting with: (i) property; or (ii) an interest in
18   property."  11 U.S.C. § 101(54).   Courts generally do
     not, however, treat the terms "transfer" and "initial
19   transferee" as conterminous.  _See, e.g._, _Bonded Fin._
     _Servs. Inc. v. European Am. Bank_, 838 F.2d 890, 894 (7th
20   Cir. 1988) ("'Transferee' is not a self-defining term; it
     must mean something different from 'possessor' or
21   'holder' or 'agent'.  To treat 'transferee' as 'anyone
     who touches the money' and then to escape the absurd
22   results that follow is to introduce useless steps . . .
     .").

23       [6]Buresh & Phillips contend that _In re Incomnet_ only
24   "adopted the dominion test in the context of determining
     whether a defendant was a 'transferee' or 'mere
25   conduit,'" and therefore "the dominion test is irrelevant
     in the instant case." (Responsive Br. at 16.)  In _In re_
26   _Incomnet_, however, the Court stated that "the dominion
     test remains a test to determine whether a recipient of
27   funds is a transferee for purposes of the bankruptcy
     code, and this inquiry is not limited to the context of
28                                           (continued...)

9

"Under the dominion test, a transferee is one who has dominion over the money or other asset, the right to put the money to one's own purposes." Id. (citation, quotation marks, and alterations omitted).  The test focuses on whether someone "had legal authority over the money and the right to use the money however" desired – for example, to invest the money in "lottery tickets or uranium stocks." Id. at 1070, 1073.  The control test, on the other hand, "takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." Id. at 1071.

The leading case on the dominion test, Bonded Financial Services, crafted it with policy considerations in mind.  See Bonded Fin. Servs. Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988).  Initial transferees are "the best monitor[s]" of fraudulent conveyances, it stated. Id. at 892-93.  This status renders them defenseless to a trustee's right to recover fraudulent conveyances. Id.  "[S]ubsequent transferees," on the other hand, "usually do not know where the assets came from and would be ineffectual monitors if they did." Id.  They, therefore, have a defense.

---

[6](...continued)
'conduit cases.'" In re Incomnet, Inc., 463 F.3d at 1073 n.11.

10

1    In its most recent statement on the issue, the Ninth

2 Circuit Court of Appeals echoed these considerations.

3 See Mano-Y&M, Ltd. v. Field (In re The Mortgage Store),

4 773 F.3d 990 (9th Cir. 2014).  In In re The Mortgage

5 Store, the Ninth Circuit noted that "[i]n virtually every

6 case involving a bankrupt entity, a third party will be

7 injured because the debtor's obligations to creditors, by

8 definition, outstrip its assets."  Id. at 997.  The

9 "injury must fall on either the transferee of the

10 conveyance or the debtor's creditors."  Id.  A court's

11 aim in these cases "must be to allocate risk such that

12 the parties tending to have the lowest monitoring costs

13 [] bear the costs of a debtor's failings."  Id. (citing

14 Bonded Fin. Servs., 838 F.2d at 892-93).  Congress

15 determined that initial transferees have the lowest

16 monitoring costs, and it therefore placed the risk of

17 fraudulent conveyances on them rather than creditors.

18 Id.

19

20    The In re The Mortgage Store Court further noted that

21 "it is unreasonable to assume" a long-time president of a

22 corporation from where a transfer came "has the proper

23 incentives to monitor [that corporation] for fraud. . . .

24 Charging a party with monitoring for fraud the entity

25 that pays its debts would undermine the very structure of

26 § 550."  Id. at 998 n.1.

27

28

This notion is not novel.  The Ninth Circuit in <u>In re</u> <u>Video Depot</u> earlier adopted the view that "[t]he mere power of a principal to direct the allocation of corporate resources does not amount to legal dominion and control."  127 F.3d at 1199 (citing <u>Bowers v. Atlanta</u> <u>Motor Speedway, Inc. (In re Se. Hotel Properties Ltd.</u> <u>P'ship)</u>, 99 F.3d 151, 156 (4th Cir. 1996)).[7]  Many principals of corporations "exercise <u>de facto</u> control over the funds of the corporations they manage," it stated.  <u>Id.</u> (quoting <u>Bowers</u>, 99 F.3d at 156).  These principals "can choose to cause their corporations to use those funds appropriately or inappropriately.  The distinction is only relevant to the question whether the principal's conduct amounted to a breach of duty to the corporation."  <u>Id.</u> (quoting <u>Bowers</u>, 99 F.3d at 156).  It is not relevant to whether the principal is an initial transferee.  A rule making "every agent or principal of a corporation . . . the initial transferee when he or she effected a transfer of property in his or her representative capacity" would give "too much power to an unscrupulous insider to effect a fraudulent transfer." <u>Id.</u>

---

[7]Although the <u>In re Video Depot</u> Court made this statement while summarizing other decisions, it sided with these decisions, and therefore adopted their reasoning.  <u>In re Video Depot, Ltd.</u>, 127 F.3d at 1199 (declining "to depart from the considered judgment of the[se] other circuits").

The <u>In re Video Depot</u> Court "conclude[d] that [a principal's] control over the business operations of [the corporation] does not, in itself, compel a finding that [the principal] had dominion and control over the funds transferred from the [the corporation] to [a third party]." <u>Id.</u> at 1199-1200.

As these cases demonstrate, a corporation's principal who effects a transfer from the corporation in his representative capacity does not have dominion over those funds in his personal capacity, and therefore does not constitute an initial transferee of those funds under the Bankruptcy Code.

**B.  Applying the Definition of "Initial Transferee"**

Applying this definition of "initial transferee," the Court holds that Bello was not the initial transferee. Bello did not have dominion over the funds in the Secret Account except in his capacity as a Walldesign representative.  Moreover, he was the sole shareholder and president of Walldesign, and he therefore did not have the proper incentives to monitor Walldesign for fraud.  Considering him the initial transferee of a transfer from Walldesign would undermine the structure of § 550(a)(1).  Accordingly, the initial transferee mantle does not belong to Bello – it belongs to Buresh & Phillips.

1      Courts have suggested that a corporate principal's

2  transfer of corporate funds into a personal bank account

3  may afford the principal dominion over those funds.  See

4  In re Video Depot, 127 F.3d at 1199.  The Secret Account

5  was not, however, Bello's personal bank account.  Bello

6  opened it in Walldesign's name as a Walldesign

7  representative, and he deposited Walldesign funds into

8  the Account.  The checks issued from the Secret Account

9  bore the title, "WALLDESIGN INCORPORATED."

11     Buresh & Phillips point to several facts to show that

12  the Secret Account was Bello's personal account: nobody

13  from Walldesign except Bello knew about the Secret

14  Account; Bello used his personal address to open it; and

15  his wife – who was not a Walldesign employee – was a

16  signatory to the Account.

18     On the other hand, Bello used Walldesign's Federal

19  Tax I.D. Number, a Statement by Domestic Stock

20  Corporation, Walldesign's Articles of Incorporation, a

21  Unanimous Consent of Shareholder of Walldesign to

22  Corporate Action, and a signature card granting him

23  signing authority as an agent of Walldesign to open the

24  Secret Account.  (See E.R. at 873-88.)  Hence, the Secret

25  Account was a Walldesign account.

Although the transfers Bello made from the Secret Account were improper and breached his duty to the corporation, he effected them in his capacity as a Walldesign representative.  He did not, therefore, have dominion over the funds in the Secret Account in his personal capacity, _i.e._, he was not the initial transferee.

**C.    The Cases Relied on by Buresh & Phillips Do Not Require a Different Outcome**

Buresh & Phillips rely primarily on two cases decided by the Ninth Circuit Bankruptcy Appellate Panel ("B.A.P."): In re Dominion Corp., 199 B.R. 410 (B.A.P. 9th Cir. 1996); and In re Dietz, 94 B.R. 637 (B.A.P. 9th Cir. 1988), aff'd on other grounds, 914 F.2d 161 (9th Cir. 1990).  Decisions of the B.A.P. are subordinate to decisions of the Ninth Circuit Court of Appeals.  See In re The Mortg. Store, 773 F.3d at 995-96 ("Although we treat the BAP's decisions as persuasive authority, we are not bound by its decisions.  In fact, as the BAP has recognized, our decisions are binding precedent that the BAP must follow.").  To the extent these decisions conflict with In re The Mortgage Store and In re Video Depot, the Court declines to follow them.

In any event, these decisions are distinguishable. In re Dominion Corp. relies on In re Dietz in relevant

part, see In re Dominion Corp., 199 B.R. at 415, so the
Court focuses on In re Dietz.

In In re Dietz, Lelon D. Dietz, doing business as
("DBA") both Com-Group Portland ("Com-Group") and
Airbrush Digest Publishing ("Airbrush"), filed for
bankruptcy protection.  In re Dietz, 94 B.R. at 638.
"[T]he designation [DBA] means 'doing business as' but is
merely descriptive of the person or corporation who does
business under some other name.  Doing business under
another name does not create an entity distinct from the
person operating the business." Pinkerton's, Inc. v.
Superior Court, 49 Cal. App. 4th 1342, 1348 (1996)
(citing Providence Washington Ins. Co. v. Valley Forge
Ins. Co., 42 Cal. App. 4th 1194, 1200 (1996)) (citations,
internal quotations, and emphasis omitted).

The bankruptcy court authorized the trustee to
operate Com-Group and Airbrush.  In re Dietz, 94 B.R. at
638.  The trustee chose to operate only Com-Group.  Id.
Dietz then secretly "opened a checking account with a
Virginia bank," deposited funds he borrowed from his
fiancé into the account, and began operating Airbrush.
Id. at 638-39.  He deposited Airbrush funds into the
account.  Id. at 639.

16

1    The B.A.P. concluded Dietz constituted the initial
2  transferee of those funds.  Since Dietz was "doing
3  business as" Airbrush, there was no truly separate
4  corporate entity.  The account was, therefore, properly
5  considered his personal checking account.
6
7    As discussed above, the Secret Account in this case
8  was not Bello's personal checking account.  In re Dietz
9  is distinguishable and does not support the position
10 advanced by Buresh & Phillips.
11
12 **D.   The Proper Role of Equitable Principles**
13    Buresh & Phillips argue that equitable principles are
14 relevant to the determination of who is the initial
15 transferee, and that the consequences of considering them
16 initial transferees are too harsh.  (See Responsive Br.
17 at 17 n.88.)  The Supreme Court in discussing the
18 Bankruptcy Code has, after all, declined to "read the[]
19 statutory words with the ease of a computer.  There is an
20 overriding consideration that equitable principles govern
21 the exercise of bankruptcy jurisdiction."  Bank of Marin
22 v. England, 385 U.S. 99, 103 (1966).
23
24    Although "the result this case produces may seem
25 harsh," the Ninth Circuit has stated that "Congress'
26 intent in enacting § 550" must govern.  In re The Mortg.
27 Store, 773 F.3d at 997.  Congress placed the risk of
28

17

fraudulent conveyances on initial transferees because they are in the best position to monitor fraud.  <u>Id.</u> Bello – as a Walldesign principal – did not have the proper incentives to monitor Walldesign for fraud.  <u>Id.</u>

Moreover, as the <u>Bonded Financial Services</u> Court stated,

> We have serious doubts . . . about the propriety
> of judges' declining to enforce statutes that
> produce inequitable results.  Bankruptcy
> statutes are not special cases. . . . [T]his
> appeal to "equity" – to deny recovery against an
> "initial transferee" within the statute – is
> different in source and scope from the way in
> which we have employed considerations of policy
> to <u>define</u> "transferee" under § 550(a)(1).

<u>Bonded Fin. Servs.</u>, 838 F.2d at 894-95 (internal citations omitted) (emphasis in original); <u>see also</u> <u>Richardson v. FDIC (In re M. Blackburn Mitchell, Inc.)</u>, 164 B.R. 117, 131-32 (Bankr. N.D. Cal. 1994).

Courts have considered equitable principles in defining the term "initial transferee" under § 550(a)(1), and this Court has taken those principles into account. It cannot employ equitable principles to reach a

1 | particular result, despite the statute's terms and in
2 | contravention of Congress' intent, as Buresh & Phillips
3 | request.

4 |

5 | **V. CONCLUSION**

6 | The Court holds Buresh & Phillips (and not Bello)
7 | constitute initial transferees under § 550(a)(1).  The
8 | Court REMANDS the case to the Bankruptcy Court for
9 | further proceedings.  This Order administratively closes
10 | the related case, case number 8:14-cv-01724.

11 |

12 |

13 | Dated:  _July 17, 2015_          _____
                                          VIRGINIA A. PHILLIPS
14 |                                  United States District Judge